The Honorable Judge of the United States Court of Appeals, in his fourth sentence, convicts the circuit. Hear ye, hear ye, hear ye. All persons having business before the Honorable Court are admonished to draw near and secure attention to the court is now sitting. God save the United States and his Honorable Court. Good morning everyone. We're here today on a Monday morning for oral arguments. We are going to begin with appeal numbers 24-1371, 72, and 73, Manassa v. NCAA. And Ms. Fagan will begin with oral argument from you. Good morning. May it please the court. My name is Elizabeth Fagan and I represent the This case is about the NCAA's promise to judge Division I student-athletes' academic performance against the academic performance of the student bodies at their respective schools. The NCAA broke that promise and that contract by setting a single arbitrary benchmark in its academic performance program called the academic progress rate. And it applied that academic progress rate whether somebody attended an Ivy League school or a state school. That promise, or when it was broke and when it was set, NCAA knew that it would disproportionately affect and discriminate against black student-athletes at Division I historically black colleges and universities, also called HBCUs. The NCAA set that arbitrary benchmark knowing that historically black colleges and universities have a mission. That mission is to educate and provide opportunities for black student-athletes and black students who might otherwise have been left behind by our educational system and our society. Ms. Fagan, a couple of questions with regard to plaintiff Freeman. Yes. Are you abandoning the argument that Freeman has standing based upon a hypothetical risk of the post-season ban? Your Honor, our position is that she had standing based on the discrimination and the discriminatory impact and burdens placed by the academic performance program. I will admit that in our complaint, we focused largely on the effects of post-season competition bans. So on that standing question, are you relying on the racial barrier argument, not the post-season ban argument? That's correct, Your Honor. And you don't dispute that Freeman's alleged injury is moot. You're just saying she falls in the inherently transitory exception to mootness. That's correct, Your Honor. All right. Thank you. Yes. What is her status right now? She is no longer a student-athlete. Okay. And so she only played in college that one year. That's correct. She played lacrosse and she filed the lawsuit at the time that she was a student-athlete and under the inherently transitory exception to mootness when it applies to class action claims. And so in the class action context, the courts will look at whether this is a wrong that perhaps we couldn't have gotten to in the judicial system. Here we have student-athletes who are always moving through the system, who are graduating. We see that with McKinney. It just happened in the related lawsuit and with our intervener. And so courts will allow these claims to proceed if it's a wrong that will continue to happen because of the continued application here of the academic performance program. Did you request that anyone other than Manassa, plaintiff Manassa, be appointed to represent the liability class? I know that Freeman and McKinney were requested to represent the injunctive relief class, but anyone other than Manassa be appointed to represent the liability class? We did not, Your Honor. We did request leave to do so within the context of our class certification motion, but the district court held that because we only did so in a footnote that that was not sufficient. And you agree you only did that in a footnote? I agree that we only did that. And didn't propose any particular person? We did not propose any particular person because at that point in time, Your Honor, we did not believe that the statute of limitations argument would be the bar that it was. Here in the Seventh Circuit with respect to the statute of limitations, a civil rights violation, the statute of limitations accrues when the plaintiff knows that a civil rights violation has occurred, not when, for example, here, his basketball team was banned from postseason competition. Ms. Fagan, before we leave Ms. Freedman, another question. So let's assume that the NCAA policy was discriminatory, as you claim, and let's assume that the barrier theory that you propose is applicable generally to the facts of this case. My understanding is that Freedman's lacrosse team in 2019-2020 was not banned. Is that correct? That's correct. Nor were the teams that came three or four years prior to that banned, right? Correct. There was a time when they had been banned. 2013 or 2014? Correct. But well before that time. And as I understand it, the APP is based on a rolling four-year look back. And so given that, how do you think Freedman, even taking your theory for what it is, how can Freedman demonstrate that there was a substantial likelihood that she would have been impacted the next season when, in fact, the three teams before then weren't banned at all? So, Your Honor, I believe that that question is largely based on how we plot our complaint. But our complaint has something else. That ban is one of seven levels of penalties that teams may have imposed under the academic performance program. Well, are there any allegations in your complaint that her team and the teams for the prior four years faced any sort of negative impact from the NCAA policy? Not in the context of penalties, but it's the burden, Your Honor, because the burden here is that these student athletes must maintain higher grades than those at their respective student bodies, which is contrary to the HBCU mission. So the NCAA, when it set the APR, it did it considering race. It ratcheted it to ensure that students at predominantly white institutions were not burdened by the level at which it set, knowing that it would burden and affect historically black colleges and universities, that these penalties would be more likely to be imposed on historically black colleges and universities and their black student athletes. And so, at the time, there was no way that this data and the rolling four-year data and the methodologies on which it's based, there's no way for any student athlete entering an HBCU to know whether their team will be penalized during their four-year stay. The concern I have with that argument, and particularly looking at northeastern Florida associate general contractors, Robertson and Ledoux, is that there it was uncontested that the challenge policies and actions would, without question, impact the plaintiffs. And so, for example, in the associate general contractor's case of minority contracting, someone who was not qualified as a minority contractor couldn't compete for those contracts, for those set-asides. Here, I think it seems to me that there is a significant question as to whether or not, had Freeman been on the team in 21-22, that that team would have been impacted at all in any real way by the NCAA APP policy. So in that way, isn't the situation with Freeman distinguishable from the cases on which you rely? I don't believe it is, Your Honor, because the APR is set on those teams no matter what. Those black student athletes at HBCUs have to work harder with less resources to meet the APR for their team to ensure that there's no additional penalties, whereas that same burden does not affect Division I teams at predominantly white institutions. And so it's not just the idea of a penalty. It's the burden of having to work harder with less resources, with less tutors. HBCUs don't have the same funding as an SEC school, for example. Certainly don't have the same admission standards as an Ivy League school, for example. And so setting a benchmark that the NCAA knows is going to penalize, for example, 70% of HBCUs when they make up just 5% of Division I schools certainly shows that there is a burden regardless of whether there's actually a penalty. And that is not a burden that black student athletes at HBCUs should have to bear. In fact, I don't believe, but I know that the Supreme Court has said that it's not the ultimate inability to achieve success. It's not that there has to be an actual penalty. It's the imposition that there's any barrier or discriminatory program in and of itself. So we don't need to show, for example, that a ban was actually ultimately imposed. We have to just show that this program is discriminatory or allege that the program is discriminatory and that it was actually imposed on freemen here. You agree that the APP does not apply to Division II schools, correct? I agree. Correct. This is a specific Division I issue. And I just want to go back for a moment. It is really critical to the mission of HBCUs. HBCUs typically have very low academic requirements for admission because they really are reaching in and providing educational opportunities for a group of people that might not otherwise be able to go to college. By imposing a singular rate on Ivy Leagues and HBCUs, the NCAA knows that it's going to require HBCUs to change their missions, to forego that, to raise their academic standards if they want to compete, and to only let in student athletes that can meet this arbitrary APR. And that's a violation or a breach of the contract. The NCAA promised to judge student athletes by the academic performance of their peers at their schools. Ms. Ficke, can I clarify one thing as to Plaintiff Manassa? The District Court found that he did not have standing to pursue his injunctive relief because he wasn't a student at the time the complaint was filed. You are not appealing that ruling, are you? I am not appealing that ruling. Our appeal as to Manassa focuses solely on the statute of limitations. And you agree that he did learn of his injury on April 26th of 2016, correct? You're not disputing that fact? We are not disputing that he learned of the postseason competition ban then. So if the date he learned of the injury is the trigger date for statute of limitations, you agree that the claims are time-barred as to him? I agree that if the court finds that the knowledge of the ban itself is the trigger date that his claim is banned. However, he could not have known and did not have the data or the economist or statistician backgrounds, of which there's only a small circle of people that know how the methodology works. He could not have known that that ban was due to a civil rights violation. How do you address our prior case, Thielen, then? Your Honor, as I sit here, I apologize. I will know for rebuttal exactly what that case says, so I do apologize. That was the case where the—it was an employment case, and we held that it's not the date when they determined why the adverse employment action took place. It's the date that they found out when it took place. Your Honor, in the employment cases generally, there are typically facts that show that the person knew, even if they didn't know their right to a claim, they knew that a younger person was hired in their place, or they knew that they were replaced with someone of a different race. And so there are the facts available to them that allow them to know that a violation has occurred on the date on which they're terminated. That did not exist here. There was no knowledge. And, in fact, even we allege in our complaint that to today, the NCAA publicly states that this is not discriminatory. But our case law doesn't add that caveat you're bringing in. Our case law and the Thielen case, which you can take a look at before you come back up here, makes clear that it's when he discovers that he's been injured. It doesn't bring in the discrimination or potential discrimination. The Wilson case does say that a civil rights claim does not accrue on the date on which the wrong occurs, but the date on which the plaintiff knows or should know that his civil rights have been violated. And that's at 956 F. 2nd at 740. And here the undisputed evidence shows that he did not know. NCAA has not submitted any evidence that he should have known on the date that his team was banned from postseason competition that it was a civil rights violation. Would you like to reserve the remainder of your time? I would. Thank you, Your Honor. Thank you, Ms. Fagan. Mr. Casey, we'll move to you now for argument on behalf of the APA League. Good morning, Your Honor. May it please the Court. My name is Brian Casey. I'm here on behalf of the APA League, the NCAA. The district court got it right in each of its decisions. It got it right in concluding that Jatah Freeman lacked standing. It got it right when it concluded on summary judgment that Mr. Manasseh's claims were time barred and got it right when it denied our plaintiff's motion for class certification and got it right with respect to proposed intervener McKinney that it was not an abuse of discretion to deny her to intervene, in particular when she had her own parallel lawsuit, asserting literally verbatim the exact same claims. I'd be happy to talk about anything in particular that you would like to. We heard a lot about what the APP does and doesn't do. The reality is that these claims really were decided on things that have very little to do with the APP. It has to do with traditional notions of Article III standing, traditional notions of what Rule 23 is and what Rule 24 is. And so while I disagree with the characterizations that Ms. Fagan had about the consequences of the APP and how it is created, and I'd be happy to address those if that's what you would like to hear about, the reality is the decisions are based on much more well-established things that are in y'all's wheelhouse. Mr. Casey, I'm sorry. Go ahead. You agreed, though, that with regard to the district court's ability to add a replacement class member, the district court certainly has discretion to do that. It has discretion to. It has discretion not to. They haven't pointed to any case that says there's abuse of discretion not to. And it's important to understand, with respect to this substitute plaintiff argument, number one, it wasn't raised in a procedurally sufficient manner. It literally was one footnote in their motion for class certification. And who they proposed was, or who they talked about proposing, was Ms. Freeman, who had a final judgment against her that she lacked standing, and Ms. McKinney, who was the subject of her own motion to intervene, which the district court denied perfectly appropriately, and I'd be happy to talk about that if you'd like. So there isn't any, they didn't proffer any valid substitute plaintiff, and they didn't raise it in a procedurally sufficient way. I mean, the court has said any number of times that arguments that are raised simply in a footnote are underdeveloped and therefore weak. They didn't file a motion for reconsideration on that aspect, did they? No, they did not. And so, yeah, they simply didn't. Mr. Casey, with regard to the Freeman standing question, specifically the racial barrier or discriminatory barrier theory, why does it matter whether the government, as opposed to a private party, is responsible for imposing the barrier? Okay, it matters because that, the case law doesn't really talk about that much, I'll be honest. Northeast Florida doesn't talk about that. Lac du Flambeau doesn't talk about it. But in any of those cases, the language is, when the government erects a barrier, and so we're not the government. If I could back up, though, for just a second. She spends a lot of time talking about the barrier theory. The barrier theory with respect to Jatow Freeman was not raised in the district court. Please look at the opposition to the motion to dismiss. It simply wasn't raised. Documentary 35, the response to the motion to dismiss, mentions it. Then there's an amendment of the complaint. I think it's Documentary 206, and it's not included. So there's a mentioning of it. The question is, is there a waiver? Well, and if you spend time looking at the opposition to the motion to dismiss. We have. The argument that they're making is that Ms. Freeman is at an increased risk of a loss of access to post-season competition penalty. And that is, it's also mentioned extensively in the complaint, that the liability class is defined that way. In their discussion about why the statute of limitations is old, they say because every time there's a loss of access to post-season penalty, it starts all over again. The focus absolutely was on loss of access to post-season competition. And there's no question that post-season ban is mentioned 50, 60 times. 60 times. A number of times. We've got to make that waiver call. But shifting back to this idea of the government versus a private party doing the imposition, you're correct that the case law doesn't directly address that. Here's your opportunity to tell us why you think the government, as opposed to a private party, should or should not be responsible for imposing the barrier. Well, I think it is because these ordinarily come up in the context of government programs. And to your point, Judge Lee, earlier, Northeast Florida is entirely different. There were minority set-asides where the plaintiff was not able to even apply. And the logic that they use is similar to the Bakke case. In Bakke, there were slots at the medical school that the white student was not able to even apply for. Here, that's not at all what's going on. And Judge Pratt's decision most recently, which we submitted to supplemental authority at the end, addresses this in more detail. Because part of what has happened here is plaintiff's theory has morphed over four years. So the theory that they're arguing now is really the theory that they argued with respect to the second motion to dismiss McKinney. It is not what they argued before. But so, to your point, the government erects a barrier, prevents people from even applying. And so the standing injury is the inability to apply. You don't have to demonstrate that you would have gotten the contract, but you do have to demonstrate that you couldn't apply. And that's what happened in Northeast Florida. Here, that's not at all the case. The APP applies equally across every team, HBCU or not HBCU, black student, not black student. And one team's success is not at all contingent on another team not getting an opportunity. In all honesty, the NCAA would love it if every single team passed and graduated more than 50% of its kids. Isn't the argument that although the APP applies across the board to Division I sports, that it applies differently to the HBCUs? And that is what causes the barrier. I think that's the argument. That is the argument, and it is factually flawed and not alleged. But we're at the motion to dismiss stage. Understood, but you have to look at the complaint as alleged. Like I said, it was about loss of access to postseason competition. Barriers aren't mentioned at all. Yeah, that's a waiver issue. That's separate from the substance of it. Sure, but there still needs to be a barrier, and there isn't one here. And as the Supreme Court said in TransUnion, if you don't have a concrete harm, you don't have standing. But we're talking about the merits. We're not talking about standing. The alleged barrier, I believe, to the extent it's in there, and I agree there's a significant waiver question, is that it applies differently to these schools. Okay, we have to be clear as to who we are talking about. Ms. Freeman is the one who did not have standing. She does not have any kind of concrete injury. She was not on a team when the complaint was filed. She never was on a team after that, and that's alleged in the complaint. She never was on a team in the one year she was there that had a penalty, and as Judge Lee pointed out, the Howard women's lacrosse team didn't have a penalty for the five, six years before. In order to have standing for injunctive relief, the injury has to be concrete and particularized. It needs to be actual and imminent, and under the barriers theory, and Judge Pratt goes into this in detail, this isn't a concrete or particularized injury. There isn't any concrete thing that happened to her that gives her standing. It also isn't actual or imminent. It hadn't happened to her, and there wasn't anything more than conjecture that it might happen to her in the future. So the barriers theory, in addition to waiver, just fails on the allegations, and it's just not how this works. Like I said, the fact that some schools, some HBCUs, have less resources than Judge Pratt talked about here, that's not the NCA's doing. Those are socioeconomic factors that, you know, if they want to blame the Louisiana legislature for underfunding Southern University or Grambling, okay, but that's not the NCAA. The NCAA sets a uniform standard for every team at every school, and it doesn't matter whether you're black or white, HBCU or not. Mr. Casey, one could imagine, though, a world where the NCAA, rather than having a one percentage that applies across the board, would have a percentage that is benchmarked to the graduation rate at the particular school, right? And so for HBCUs, for example, where their graduation rate is significantly lower than, I don't know, the Ivy League schools or what have you, and the NCAA's concern is that athletes not be treated, given any special treatment, one could imagine a world where the benchmark would be basically, again, relative school by school depending on their graduation rate. One can posit that, and that's the argument that they are trying to have tried to make. That doesn't really directly address any of the reasons why any of the decisions, why any of the district course decisions happened the way they happened, but it is also equally appropriate. Just out of curiosity, is that something that the NCAA considered, do you know, to your knowledge? Well, now that we have been in litigation about this for three years, they have certainly considered it to the extent that they have raised it. But as a general rule, what they have decided is that a 50 percent graduation rate is an appropriate benchmark for everyone. And some would argue that that's too low, but they've argued that that is sufficient and that that is what they have focused on thus far. Now keep in mind, and this is really germane to any of the claims that are here, that there are a number of things they call waivers and filters that also apply to mitigate the fact that, you know, the APR might be less than 930 on the rolling four-year average. And that's, we're now pretty far in the weeds of summary judgment and not, you know, what the merits of any of these decisions. So they try to take that stuff into effect. So I guess I'd like to go back to the statute of limitations when that runs. Can you address Ms. Vega's argument that Wilson applies on the statute of limitations? Yeah, that's some kind of loose language. It's still, as the Supreme Court said in Ricks, as this Court said in Thielen, and Loftin, and Brademas, and we cite all these in our briefs, that the statute of limitations begins to run either at the date that the injury, that the act happens, or when you know of the injury. It is not when somebody tells you a legal theory that the injury might be allegedly unlawful. And the Supreme Court, like I said, pointed that in Ricks. It says when we told you you were going to be denied tenure, that's when the statute begins to run, not when you actually lost your job. Same with Thielen and Brademas. And her argument kind of points this out. She points to the fact that we still don't believe it's discriminatory. On that theory, the statute of limitations would never run. It would never accrue. So are you saying Wilson has been implicitly overruled? No, I'm just saying it's loose language. I'm saying that the reality is it is when the plaintiff discovers that they have been injured that is the operative time frame. And it is absolutely undisputed that Mr. Manassa was told that he was going to, his team was going to get a postseason ban the following March, on April 26th of 2016. And so he just is too late. And to your point, Your Honor, they aren't ever even challenging the fact that he doesn't have standing for the injunctive relief class. Because he had been out of school for three years and therefore wouldn't get the benefit of any kind of changes. I guess I'd say very briefly, the denial of the motion to intervene also was absolutely not an abuse of discretion. Timeliness is a multi-factor test and it focuses on prejudice to the original parties. And it was 21 months after the amendment deadline and after summary judgment and class certification briefing. And also she was able to litigate her own lawsuit and has been doing that to this day. She's lost every time, but she's been doing that to this day. Thank you, Mr. Casey. Thank you, Your Honor. Ms. Fagan, we'll go to you now for a rebuttal argument. Thank you, Your Honors. I'll start with Thalen since that was a question specifically asked of me. I think the critical thing with respect to Thalen is that in the employment discrimination context, there are specific time periods imposed and specific case laws to those cases, including with respect to the timing of filing an EEOC claim, et cetera. That is not true here. We're talking about college student athletes who are told about a team action. If someone loses practice time and is told they can only practice for 15 minutes this week, are they going to hire a lawyer to find out if it's because they're black or because they're Hispanic or because they attend an HBCU or some other discriminatory reason? No. They are going to believe the NCAA and their coaches that it's because their grades weren't good enough. So I believe that Wilson is still good law, and I do ask that the court rely on that. Second, with respect to waiver, I think that there's a really critical issue here. Mr. Casey mentioned the definition of the liability class, but the definition of the injunctive release class is not limited to Division I HBCU student athletes who were subject to a post-competition ban. It includes all student athletes at Division I or all black student athletes at Division I HBCUs. That's in the class definition at paragraph 214. But we also do raise it several times in the complaint, and we do raise it in the motion to dismiss. I agree with everyone that we focus on the impact of the post-season competition bans because it provides the most stark example of the discrimination here, but I do ask that the court look to see that the underlying theory there is the discrimination. And you're relying there on docket 35, the response to the motion to dismiss, is that correct? As well as the complaint, Your Honor, yes. Okay. Thank you. Thank you very much. Thank you, Ms. Fagan. Thank you, Mr. Casey. The case will be taken under advisement.